### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**SHELLY ARNOLDI**,

                Plaintiff,

                v.

**THE BOARD OF TRUSTEES,**
**NATIONAL GALLERY OF ART,** *et al.*,

                Defendants.

Case No. 1:20-cv-00091 (TNM)

### MEMORANDUM OPINION

The National Gallery of Art suspended, then terminated, Shelly Arnoldi for insubordination and dishonesty.  Arnoldi sued, claiming that the Gallery unlawfully discriminated against her based on her gender, retaliated against her for complaining about the discrimination, and subjected her to a hostile work environment.  Before the Court is the Gallery's motion for summary judgment.

The Court determines that no reasonable jury could find in Arnoldi's favor.  The Gallery has proffered legitimate, nondiscriminatory, and nonretaliatory reasons to support its decisions, and Arnoldi has not proffered evidence undermining them.  The record also lacks evidence from which a jury could find a hostile work environment.  The Court will therefore grant the Gallery's motion.

### I.

Arnoldi began working for the Gallery in 2016 as Deputy Chief of Facilities Management ("AFM"), Engineering.  Defs.' Statement of Material Facts ("DSMF") ¶ 1, ECF No. 13-2; Pl.'s

Resp. to Defs.' Statement of Material Facts ("Pl.'s Resp. to DSMF") ₱ 1, ECF No. 15-10.[1]  In

that position, she reported to Dave Samec, the AFM Chief.  DSMF ₱ 4.  Samec then reported to

the Gallery's Administrator, Darrell Willson.  *Id.* ₱ 5.

       If "every unhappy family is unhappy in its own way," *see* Leo Tolstoy, *Anna Karenina* 12

(Penguin Books 2002) (1878), the AFM family was unhappy because of its lack of

communication and teamwork.  *See* Defs.' Ex. I ("Dec. 2016 Memo") at 2, ECF No. 13-12; *see*

*also* DSMF ₱ 9 (citing Defs.' Ex. H ("Sept. 2017 Memo") at 2, ECF No. 13-11).[2]  In December

2016, Samec circulated a memo to the AFM Deputies and Assistant Deputies setting forth new

protocols to remedy the situation.  DSMF ₱ 11.  Among other things, the memo addressed:

improving meeting etiquette, curbing the spread of rumors, requiring at least one decision-

making person from each department (such as a deputy chief) work onsite at the Gallery during

workdays, and terminating alternative work schedules ("AWSs") beginning in January 2017.  *Id.*

₱ 12; Dec. 2016 Memo at 3.

       Samec also hired executive coaches/consultants to help AFM improve.  DSMF ₱ 13.

AFM Deputies, including Arnoldi, participated in individual and group coaching sessions each

month.  *Id.* ₱₱ 14–16, 18.  During one group coaching session, "other deputies and assistants"

became "very upset" when Arnoldi said that she believed she was senior to them and second in

---

[1]  The Court draws from the Gallery's statement of material facts, which Arnoldi has mostly admitted.  *See* Pl.'s Resp. to DSMF ₱₱ 1–129.  As the Gallery points out, "with just one exception, Ms. Arnoldi admits all 129 statements of undisputed facts that the Gallery identified." Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") at 5 n.1, ECF No. 18-1.  Arnoldi also declined to submit her own separate statement of facts directing the Court to other parts of the record.  *See* LCvR 7(h).  The Court may thus treat as admitted any facts identified by the Gallery that Arnoldi does not specifically controvert.  *See id.*; *accord* Standing Order at 7, ECF No. 2.

[2]  All page citations refer to the page numbers that the CM/ECF system generates.

command to Samec.  Defs.' Ex. J ("Arnoldi Dep.") at 17–18, ECF No. 13-13; DSMF ⁋ 17.  In

the individual sessions, Arnoldi's coach raised communication, mindfulness, and professionalism

issues—much like feedback Arnoldi "had received many times in previous jobs."  DSMF ⁋⁋ 19–

20.  Arnoldi testified that she had been told to "work on [her] soft skills" often and that, in other

jobs, individuals had reacted strongly to her comments.  Arnoldi Dep. at 22.  She also stated that

she did not believe she was doing anything wrong and that she was not going to change.  *See*

DSMF ⁋ 21.  The consultants ultimately informed Willson that Arnoldi was likely incapable of

resolving her interpersonal challenges.  *See id.*; Defs.' Ex. K at 3, ECF No. 13-14.

Even with the benefit of executive coaches, things were slow to improve in AFM.  Samec

circulated another memo in September 2017, explaining that after months of working with the

team and the coaches, "it is evident that several of you are not improving or not improving fast

enough in both individual and team communications."  DSMF ⁋ 22 (quoting Sept. 2017 Memo at

2).  So he instituted new changes, including canceling AWSs and regular telework for AFM

Deputies because "the nature of [the] positions" and "the need to improve . . . project planning,

coordination and communication" required that they "be at work regularly Monday to Friday."

Sept. 2017 Memo at 3.  The memo explained that ad hoc telework would be "considered on a

case-by-case basis and shall be used as a rare exception versus a norm" and that a Deputy's

request to ad hoc telework "must be pre-approved by the Chief in advance of the telework

period."  *Id.*  The memo also stated that each department "shall have either their Deputy or

Assistant Deputy present for duty at work during the core business hours of 8:30 am to 3:30 pm,

Monday to Friday."  *Id.*

Arnoldi and Samec repeatedly clashed over telework.  In October 2017, Samec emailed

Arnoldi to inquire where she was when did not report to work.  Defs.' Ex. M ("Telework Docs.")

at 2, ECF No. 13-16; DSMF ⁋ 28.  When Arnoldi responded that she was "[w]orking from home," Samec reminded her that he had "cancelled all AWS and Telework for Deputies and Assistants."  Telework Docs. at 2.  Arnoldi then said that she would put in a leave slip for that day.  *Id.*

A couple of months later, in December 2017, Arnoldi emailed Samec on a Friday morning letting him know that she was "going to telework today."  *Id.* at 3; DSMF ⁋ 31.  Samec responded that Arnoldi's request was "[a]pproved for today," but he asked Arnoldi to "[p]lease coordinate any requests for telework" with him further in advance.  Telework Docs. at 3.  He also told Arnoldi that the Engineering Department was "a ghost town today," adding that "[t]he Gallery expects us to be on site M-F during core business hours" and that it was "more convenient" for AFM personnel to be on site "to respond to occasional emergencies."  *Id.*

Samec also raised telework during an April 2018 meeting with Arnoldi.  He warned (among other things) that Arnoldi should not "abuse telework."  *Id.* at 4; DSMF ⁋ 34.  Samec's notes show that he shared that there was "a perception that [Arnoldi was] teleworking a lot" and that "[t]elework is not an AFM entitlement."  Telework Docs. at 4.

Despite the back and forth between Arnoldi and Samec, the telework problems continued.  In May 2018, Arnoldi requested to telework the next day.  DSMF ⁋ 35.  Samec rejected the request, citing his September 2017 memo.  *Id.*  Then in August 2018, Arnoldi teleworked four times without approval.  *See id.* ⁋ 36.

More conflict arose in June 2018, when the Gallery hired Samantha Dennison as the new Deputy Chief of Facilities Management, Maintenance.  *See id.* ⁋ 37.  Samec chose the hiring panel, and Arnoldi was not on it.  *See id.* ⁋⁋ 38–40.  Although Arnoldi acknowledged that it was Samec's decision whom to include on the panel, she believed she was more experienced than his

picks.  *See id.* ⁋⁋ 39–40; Arnoldi Dep. at 32–34.  She voiced her objection to Samec.  DSMF ⁋ 38.  Arnoldi then approached three other Gallery employees to complain about her non-selection to the panel.  *Id.* ⁋⁋ 41–48.  She also requested Dennison's application materials to gauge her experience.  *Id.* ⁋ 46.

Another point of contention surfaced between Arnoldi, Samec, and other employees in late summer 2018.  It stemmed from the Gallery's "Bronze Gates Repair Project," involving the large doors at one of the Gallery's entrances.  Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mot.") at 14, ECF No. 13-1.  The Gallery received a proposal from a company called "Metal Man," but the Gallery's contracting officer for the project determined that it was late and incomplete.  DSMF ⁋⁋ 49–50.  Arnoldi, on the other hand, advocated for Metal Man.  *Id.* ⁋ 53.  After obtaining a copy of its proposal, she forwarded it to Dennison, who was not involved in the procurement action and had not executed the necessary non-disclosure or conflict-of-interest paperwork.  *Id.* ⁋ 52; Defs.' Ex. N ("Susp. Prop.") at 6, ECF No. 13-17.

Samec and Rodney Cartwright, Chief of Procurement and Contracts, warned Arnoldi that she should not be involved with the procurement solicitation.  DSMF ⁋⁋ 54–55; Susp. Prop. at 6.  Undeterred, Arnoldi emailed Cartwright requesting that he include her on correspondence relating to the procurement.  DSMF ⁋ 56; Defs.' Ex. S ("Bronze Gates Emails") at 11, ECF No. 13-22.  Cartwright responded that he "continue[d] to be greatly concerned" because Arnoldi "reviewed and evaluated a proposal that [she] never should have received."  Bronze Gates Emails at 10.  Arnoldi even communicated with Metal Man about its proposal.  DSMF ⁋ 58.

Around the time of the Bronze Gates issue, Samec and Arnoldi tangled again.  Samec directed Arnoldi to schedule a group meeting about Engineer Technician Bryan Allen's departure from the Gallery.  DSMF ⁋⁋ 59–60.  When Arnoldi failed to do so, Samec repeated his

request three days later. *Id.* ¶ 61. Arnoldi responded by telling Samec that she had been working

with Allen on his transition and that her plan was to instead hold individual meetings the next

week. *Id.* ¶ 62; Defs.' Ex. T ("Allen Meeting Emails") at 2–3, ECF No. 13-23.

Samec then scheduled the meeting himself and sent an email invitation to Arnoldi and

others. DSMF ¶ 64; Allen Meeting Emails at 2. She declined. Defs.' Ex. T at 2, ECF No. 13-

24. In other emails, Arnoldi, copying her staff, told Samec that she did "not find it beneficial to

meet with such a large group" because there were "several different projects and contracts and

few of those on your invitation are involved in all of it." Allen Meeting Emails at 5. She stated

that she was "not sure what [Samec's] motive" was, but "it does not appear to be in the best

interest of myself or my staff to attend." *Id.* In a later email, she told Samec "[n]either I nor my

staff will be attending" the meeting because "[y]ou have all the information you requested." *Id.*

at 6. Samec later learned Arnoldi attended a goodbye lunch for Allen instead of the scheduled

meeting. Susp. Prop. at 9.

By October 2018, Samec had had enough. He proposed suspending Arnoldi. *Id.* at 2.

The proposal reflected charges of unprofessional and disruptive conduct, failure to follow

supervisory instructions, violating a procurement standard of conduct, and lack of candor. *Id.*

Arnoldi responded in writing. DSMF ¶ 86. Her response stated, among other things, that she

"did not receive counseling or a warning that [she] had acted inappropriately" about telework.

Defs.' Ex. Y ("Arnoldi Susp. Resp.") at 5, ECF No. 13-28.

Chief Registrar Michelle Fondas, who was outside Arnoldi's supervisory chain, rendered

the decision to suspend Arnoldi in February 2019. DSMF ¶¶ 84–85, 87. Fondas found, among

other things that:

- Samec had counseled Arnoldi about telework policies but she failed to follow them;

- Arnoldi undermined Samec's decision to not include her on the hiring panel;

- Samec and others directed Arnoldi to disengage from the Metal Man proposal, but she did not; and

- Arnoldi defied Samec's instructions to schedule the meeting on Allen's departure.

*Id.* ¶¶ 89–93; Defs.' Ex. W ("Susp. Dec.") at 5–7, 11–13, 15–16, ECF No. 13-26.

Arnoldi served her seven-day suspension in March 2019.  DSMF ¶¶ 96, 99.  While suspended, she was in "non-pay and non-duty status."  *Id.* ¶ 100.  By this time, Samec had resigned from the Gallery and John Robbins succeeded him as Arnoldi's supervisor.  *Id.* ¶¶ 7–8.

Samec was gone, but the conflict remained.  On the first day of her suspension, Arnoldi sent an email, with Robbins copied, about the acquisition of equipment.  *Id.* ¶ 103.  Robbins responded to Arnoldi that day, stating that she was "not allowed to work on Gallery business during [her] suspension" and that all matters should be referred to him.  *Id.* ¶¶ 104–05 (quoting Defs.' Ex. AA at 2, ECF No. 13-30).  Still, Arnoldi approved invoices and sent 40 emails during her suspension period.  *Id.* ¶ 106.

In April 2019, Robbins proposed removing Arnoldi.  *Id.* ¶ 107.  Manager of Fine Arts Risk and Special Projects Nancy Hoffmann—outside Arnoldi's supervisory chain—served as the deciding official on Arnoldi's removal.  *Id.* ¶¶ 116–17.  Arnoldi submitted written and oral responses to the removal proposal.  *Id.* ¶ 118.

Hoffmann decided to remove Arnoldi on the grounds cited in Robbins's proposal.  *See id.* ¶¶ 108–115, 122–23; Defs.' Ex. CC ("Removal Prop.") at 2–5, ECF No. 13-32.  She concluded that Arnoldi made a false statement in responding to the suspension proposal by stating that she had "not receive[d] counseling or warning" about telework, as Arnoldi had indeed received warnings from Samec.  Defs.' Ex. DD ("Removal Dec.") at 8–9, ECF No. 13-33.  Hoffmann also

found that Arnoldi approved invoices without authority and disregarded instruction by working while suspended.  *Id.* at 12–13.  Arnoldi's removal became effective in June 2019.  DSMF ⁋ 126.

Arnoldi now sues the Gallery and its Director.  Compl. ⁋ 2, ECF No. 1.  She alleges discriminatory treatment on the basis of gender, retaliation for engaging in protected activity, and a hostile work environment—all under Title VII.  *Id.* ⁋⁋ 54–80.  Arnoldi claims that she engaged in protected activity in April 2018 when she requested Equal Employment Opportunity ("EEO") counseling.  DSMF ⁋ 127.  She also submitted a formal EEO complaint in July 2018.  *Id.* ⁋ 128. In that complaint, Arnoldi contended that she experienced discrimination when Samec counseled her in April 2018 and a hostile work environment because of her gender.  *Id.* ⁋ 129.

The Gallery moves for summary judgment.  The motion is ripe.[3]

## II.

To prevail at summary judgment, the moving party must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  The moving party has the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once it has met this burden, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (cleaned up).

---

[3]  The Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331.

At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn" in her favor. *Anderson*, 477 U.S. at 255. But the nonmoving party's opposition must consist of more than mere unsupported allegations or denials; it must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 324. The nonmoving party must provide evidence that would permit a reasonable factfinder to find in her favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). A "mere . . . scintilla of evidence in support of" the nonmovant's position cannot defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## III.

The Court considers Arnoldi's (A) discrimination and retaliation claims, as well as her (B) hostile work environment claim.

## A.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against its employees based on, among other characteristics, an employee's sex. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.). As the parties agree, the familiar *McDonnell Douglas* burden-shifting framework governs Arnoldi's discrimination and retaliation claims. *See* Defs.' Mot. at 24, 26; Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 13–14, 23, ECF No. 15; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The "plaintiff must first establish a prima facie case." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). "To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085,

1091 (D.C. Cir. 2015). And to state a prima facie case of retaliation, a plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."[4] *Jones*, 557 F.3d at 677.

"If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions." *Id.* (cleaned up); *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) ("clarify[ing] the requirements for an adequate evidentiary proffer by the employer" (cleaned up)). To survive summary judgment, the plaintiff must then produce evidence to show that the employer's stated reason is pretextual. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

For both the discrimination and retaliation claims, though, "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady*, 520 F.3d at 493 (cleaned up); *Jones*, 557 F.3d at 678. At that point, a court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494. The Court heeds this directive.

The Court construes Arnoldi's discrimination and retaliation claims as based on two separate adverse actions: her suspension and her subsequent termination. The Court determines: (1) that the Gallery has provided nondiscriminatory and nonretaliatory reasons to support both

---

[4] Arnoldi contends that the EEOC has "held that with respect to Federal employees," "the but-for causation element is not applicable." Pl.'s Opp'n at 13. But Arnoldi cites only an EEOC petition for support. *See id.* And caselaw confirms that the but-for standard applies. *See, e.g.*, *Salak v. Pruitt*, 277 F. Supp. 3d 11, 14 (D.D.C. 2017) (rejecting a Title VII retaliation claim because "no reasonable jury could find that the agency" took adverse action "*because* of [the plaintiff's] protected activity"); *Saunders v. Mills*, 172 F. Supp. 3d 74, 86 (D.D.C. 2016) ("[R]etaliation claims must be proved according to traditional principles of but-for causation.").

actions; and (2) that Arnoldi has not produced evidence from which a reasonable jury could find that the Gallery's stated reasons were pretextual.

**1.**

The Court considers Arnoldi's suspension first. The Gallery proffers several reasons for suspending Arnoldi. They mostly center on her insubordination.

*First*, the Gallery argues that Arnoldi undermined Samec's decision to hire Dennison. Defs.' Mot. at 28–29. Even while acknowledging that Samec had discretion to form the hiring panel, Arnoldi openly challenged Samec's authority. *See* DSMF ¶¶ 38–46. She complained to at least three other employees about Samec and also asked for Dennison's application materials. *See id.* ¶¶ 41–46; Arnoldi Dep. 34–37.

*Second*, the Gallery says that Arnoldi failed to follow telework protocols. Defs.' Mot. at 29. Although Samec reminded Arnoldi of the Department's telework policies, she teleworked repeatedly without following the appropriate procedures. DSMF ¶ 36; Arnoldi Dep. at 38–40.

*Third*, the Gallery cites Arnoldi's interference with the procurement process for the Bronze Gates Repair Project, contra Samec's instruction. Defs.' Mem. at 29–30. Arnoldi continued to advocate for a proposal that was rejected by those responsible for the project. DSMF ¶¶ 49–53; Susp. Prop. at 5–6.

*Fourth*, the Gallery points to Arnoldi's conduct around Allen's departure. Defs.' Mem. at 30. Arnoldi disregarded Samec's request that she schedule a team meeting, in preference for her own process.[5] DSMF ¶¶ 62–68.

---

[5] The Gallery explains another reason for Arnoldi's suspension: that she had been permitting Allen to telework often, despite Samec's instructions, which also cast doubt on her certification of Allen's parking pass (stating that he was onsite five days per week). Defs.' Reply at 14 n.4; DSMF ¶¶ 81–83; Susp. Prop. at 10. But the Gallery appears to focus more clearly on Arnoldi's failure to follow Samec's instruction to schedule the transition meeting rather than her lack of

11

Next, Arnoldi's removal.  The Gallery proffers two justifications.  *First*, the Gallery contends that Arnoldi made a false statement in response to Samec's proposal to suspend her.  Defs.' Mot. at 41–42.  The proposal stated that one reason for Arnoldi's suspension was her failure to follow Samec's instructions on telework.  Susp. Prop. at 4–5.  In responding to this charge, Arnoldi's written response stated: "I did not receive counseling or a warning that I had acted inappropriately."  Arnoldi's Susp. Resp. at 5.  Citing several documents showing that Samec reminded Arnoldi of the telework protocols, Robbins and the deciding official (Hoffmann) determined that this response showed a lack of candor.  Removal Prop. at 2–4; Removal Dec. at 3–9.

*Second*, the Gallery argues that Arnoldi ignored instructions that she was not to work on Gallery business during her suspension.  Defs.' Mem. at 43–44.  Despite the suspension decision's direction that she would not be in "pay and duty status," Susp. Dec. at 19, and Robbins's instruction that she was "not allowed to work on Gallery business" while suspended, Arnoldi sent 40 work-related emails, DSMF ¶¶ 104, 106.

The Gallery has made "an adequate evidentiary proffer."  *Figueroa*, 923 F.3d at 1087 (cleaned up).  It has supported its justifications with evidence that the Court may consider at summary judgment, *id.*, including deposition testimony, supporting emails, and Gallery records, *see Clinton v. Granholm*, No. 18-cv-991-DLF, 2021 WL 1166737, at *8 (D.D.C. Mar. 26, 2021) (finding that the defendant "submitted substantial documentary evidence," including "the Notice of Proposed Removal," the "Decision on Notice of Proposed Removal," and "primary source communications").  "This competent evidence is sufficient to permit a reasonable jury to

---

candor about Allen's telework.  *See* Defs.' Reply at 13–14 & n.4.  The Court focuses where the Gallery does, although the telework and parking pass approval issue likely could provide a separate legitimate justification for Arnoldi's suspension.

conclude that the [Gallery's] motivation was [nondiscriminatory and nonretaliatory], is facially credible, and is 'clear and reasonably specific' enough to have provided [Arnoldi] 'with a full and fair opportunity to attack the explanation as pretextual.'"  *Cauthen v. District of Columbia*, 459 F. Supp. 3d 134, 141 (D.D.C. 2020) (quoting *Figueroa*, 923 F.3d at 1087–88).

Time and again, courts have held that failure to follow supervisory instructions is a legitimate reason for adverse employment action, including termination.  *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008) (Kavanaugh, J.) (holding that the government offered "legitimate, nondiscriminatory reasons" for the adverse actions, including that the employee "fail[ed] to comply with instructions or respect [his supervisor's] authority"); *Webster v. U.S. Dep't of Energy*, 443 F. Supp. 3d 67, 83, 85 (D.D.C. 2020) (finding justifications that an employee "blatantly refus[ed] to complete the tasks that were assigned to her," delayed performing a task "despite requests from [her] supervisor," and "failed to attend scheduled meetings with [her] supervisor" were legitimate (cleaned up)).  Lack of candor is no doubt a legitimate reason too.  *See, e.g.*, *Tovihlon v. Allied Aviation, Inc.*, 323 F. Supp. 3d 6, 17 (D.D.C. 2018) ("the defendants have offered legitimate, nondiscriminatory reasons for their actions," including that the plaintiff was terminated "for insubordination" and "lying during the ensuing investigation").  Arnoldi does not provide the Court with contrary authority.

The Gallery has thus satisfied its burden to articulate legitimate, nondiscriminatory, and nonretaliatory reasons for Arnoldi's suspension and termination.

**2.**

The Court turns to the "central issue":  whether Arnoldi has "produced evidence sufficient for a reasonable jury to find that the [Gallery's] stated reason[s] w[ere] not the actual

reason[s] and that the [Gallery] intentionally discriminated against" Arnoldi based on her gender. *Brady*, 520 F.3d at 495.  She has not.

Arnoldi challenges the Gallery's stated reasons as pretextual.  *See, e.g.*, Pl.'s Opp'n at 7, 10.  But for the most part, Arnoldi concedes the facts underlying the Gallery's proffered reasons. Her contentions boil down to justifications of her conduct.

*First*, Dennison's hiring.  Arnoldi does not dispute that she challenged Dennison's hiring and Samec's decision not to include her on the selection panel.  DSMF ¶¶ 38–46; Pl.'s Opp'n at 16–17.  She contends only that she had good reason for "oppos[ing] . . . Ms. Dennison's hire," including that the last person who held Dennison's position had caused her trouble.  Pl.'s Opp'n at 16.  Arnoldi also explains that "a jury could find that [she] should have been on th[e] panel" and that there was merely "a difference of opinion" between Samec and her that did not "justif[y] a suspension." *Id.* at 17.  More, Arnoldi acknowledges that she approached others about Dennison's selection, but says that "she had the right to these inquiries" and "did not act in a disruptive manner." *Id.*

Arnoldi misses the point.  "Once the employer has articulated a non-discriminatory explanation for its action," which the Gallery has here, "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (cleaned up).  It does not matter whether Arnoldi's has justified her conduct or shown that the Gallery made the wrong decision in suspending her, but only whether Arnoldi has shown that the Gallery's stated reason for her suspension—that she undermined her supervisor and was disruptive—is pretextual. *See Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (explaining that courts "may not second-guess an employer's personnel decision absent demonstrably

discriminatory motive" (cleaned up)).  And while Arnoldi contends that "at no time did she raise her voice or use[] unprofessional language or gestures," Pl.'s Opp'n at 17, that is irrelevant because those are not the Gallery's justifications.

*Second*, consider the telework infractions.  While conceding that she teleworked without permission four times, Arnoldi argues that Samec's September 2017 memo "did not change the status quo."  *Id.* at 17–18.  Not so.  The memo "cancelled" AWSs and "Regular Telework for AFM Deputies" and stated that ad hoc telework "shall be used as a rare exception versus a norm."  Sept. 2017 Memo at 3.  It also specified protocols for ad hoc telework requests, including that the Chief "pre-approve[]" them "in advance of the telework period" and that employees provide "[a] list of work to get done during that particular telework period."  *Id.* While Samec approved some of Arnoldi's telework requests after this memo, he continued to remind her of the protocols.  *See* Telework Docs. at 2–5.  Arnoldi's contention to the contrary lacks support in the record and does not present a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c).

Arnoldi also appears to rely on timing to undermine the Gallery's reliance on her telework infractions.  Arnoldi suggests that "the timing . . . is suspicious" because the alleged telework infractions were "just a few months after Mr. Samec learned of the discrimination complaint filed with the EEO Counselor."  Pl.'s Opp'n at 18.

But the telework infractions are not the adverse action—her suspension was.  The Gallery suspended Arnoldi in February 2019, *see* Susp. Dec. at 2, which is ten months after she first engaged in protected activity and eight months after she contends Samec was aware of her complaint, *see, e.g.*, Pl.'s Opp'n at 14 (acknowledging that protected activity occurred in April 2018 and that Samec and Willson learned of it in June 2018).  If the relevant adverse event was

Samec's suspension proposal, it still occurred six months after she engaged in protected activity and four months after Samec found out about the complaint. *See* DSMF ⁋ 69.  Even if the Court considered these events close in time—which it does not—temporal proximity could not by itself support a finding of pretext. *See Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) ("[D]islodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires positive evidence beyond mere proximity." (cleaned up)).

*Third*, the Bronze Gates incident.  Arnoldi acknowledges that the Gallery's "justification for discipline seems reasonable."  Pl.'s Opp'n at 19.  Yet she asserts that she "did not violate any Federal or NGA regulation" and that she believed "it was her duty" to be involved with the proposals.  *Id.*  Arnoldi thus contends that "there is an issue of fact as to whether Mr. Samec would have proposed [her] suspension absent the discrimination complaints."  *Id.*  Arnoldi again misses the point.  The Gallery's justification here is not that she violated any regulations, but that she disregarded her supervisor's instructions to disengage from the project.  Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") at 12, ECF No. 18-1.  Although she challenges the correctness of those instructions, that does not affect whether the Gallery believed Arnoldi's insubordination warranted suspension.  *Cf. Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1248 (D.C. Cir. 2011) (Kavanaugh, J.) ("the question whether [the plaintiff] was actually at fault . . . is irrelevant if [the employer] believed she was").

*Fourth*, Allen's departure.  Arnoldi does not dispute that she ignored Samec's instruction to schedule a meeting; she instead tries to justify her actions by arguing that she "had already put significant work into learning about Allen's projects and scheduling smaller meetings with the relevant personnel."  Pl.'s Opp'n at 10.  She also contends that Samec failed to meet with her according to her proffered plan.  *See id.*  As with Arnoldi's other arguments, her disagreement

with Samec does not create doubt that her insubordination was not the actual reason for her suspension. *Cf. Pauling v. District of Columbia*, 286 F. Supp. 3d 179, 204–05 (D.D.C. 2017) ("[T]he plaintiff must do more than merely state a disagreement with, or disbelief of, the explanation to satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.").

Arnoldi's attempts to rebut the Gallery's reasons for her removal likewise fail. She disputes that she made a false statement in response to the suspension proposal because "the emails and comments from Mr. Samec should not be considered counseling." Pl.'s Opp'n at 10. But Hoffmann understandably rejected this argument when she decided to remove Arnoldi. *See* Removal Dec. at 4–9.

No plausible reading of the record supports Arnoldi's assertion. It instead shows that Samec repeatedly and directly explained the telework policy to Arnoldi. *See* Telework Docs. at 2–5. Indeed, Arnoldi acknowledges that three of the communications from Samec were "at best, reminders" and that the fourth is "phrased as a reminder and note regarding perception" of her telework. Pl.'s Opp'n at 10–11; *see also id.* at 21. More, Arnoldi's affidavit to the EEO investigator referred to the April 2018 meeting with Samec by stating that "Mr. Samec came to me with notes and counseled me." Defs.' Ex. A ("Arnoldi Aff.") at 9, ECF No. 13-4; *see also id.* ("When I saw that Mr. Samec was counseling me I left and I told him I was going to HR.").

As to her conduct while suspended, Arnoldi concedes that she "perform[ed] work during her suspension." Pl.'s Opp'n at 11. But she argues that she did so because she was "trying to delay the imposition of the suspension." *Id.* Again, the Gallery considered and rejected this justification because the evidence showed that Arnoldi sent emails even after she had

"definitively heard not only from Mr. Robbins, but also from the Gallery's Director, that the suspension would not be delayed." Removal Dec. at 11–12. Arnoldi has no answer to this. In any event, Arnoldi does not dispute the bottom-line conclusion that she disregarded Robbins's explicit instructions to stop working on Gallery business. DSMF ¶¶ 104–06. She instead sent not just a few, but 40 work emails—including approving invoices—while she was in non-duty status. *Id.* ¶ 106.

Arnoldi also contends that she kept working while on suspension because "[s]he was simply trying to keep the department moving" and that "there is no allegation or implication that [she] had a nefarious or improper purpose." Pl.'s Opp'n at 11. These arguments are irrelevant. Arnoldi does not dispute that she disregarded her supervisor's instructions while serving a suspension for disregarding her former supervisor's instructions.

The Court thus agrees with the Gallery that the bulk of Arnoldi's opposition addresses the wrong question. *See* Defs.' Reply at 4. The Court's task is not to decide whether the Gallery made the right calls, only whether its stated reasons were not the actual reasons. *See Hairston*, 773 F.3d at 272. And Arnoldi's objections do not undermine the Gallery's stated reasons.

Along with challenging the Gallery's justifications, Arnoldi also contends that she has proffered evidence from which a jury could infer that discriminatory motives lurk behind them. Although her brief is not a model of clarity, the Court construes it as raising three arguments.

For starters, Arnoldi points to Samec's conduct. She says that he made sexist statements, including that Arnoldi should bring "baked goods," asking whether she had a "pink hard hat," calling her a single mother, and comparing her to "Tim the Tool Man's assistant" when she wore jeans and a polo to work. Pl. Opp'n at 5 (cleaned up); *see also id.* at 24. Arnoldi also argues that Samec failed to reprimand others for raising their voice at her, talking over her, and being

"generally aggressive" during meetings. *Id.* at 4, 24. Finally, Arnoldi says that Samec "dismiss[ed] [her] supervisory decisions," including (for example) refusing to approve Arnoldi's request to give one of her direct reports a monetary award. *Id.* at 24–25.

To be sure, some of these allegations are disturbing. But Arnoldi has not connected Samec's conduct to either her suspension or termination. A plaintiff "may rely on evidence of discriminatory statements or attitudes" in order "[t]o show that proffered reasons for termination are pretextual." *Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 47 (D.D.C. 2017) (cleaned up). But the D.C. Circuit's "cases recognize that stray remarks by non-decisionmakers are not generally direct evidence of discrimination." *Waggel*, 957 F.3d at 1374; *accord Samuel*, 258 F. Supp. 3d at 47 ("[S]tray comments lacking any temporal or substantive relationship to the adverse employment action are not evidence of discriminatory intent." (cleaned up)). So the fact that Samec did not decide to suspend or terminate Arnoldi undermines Arnoldi's reliance on Samec's statements and conduct. *See* Susp. Dec. at 2–3; Removal Dec. at 2–3. In fact, Samec was not even her supervisor by the time of her termination. DSMF ¶¶ 101–02. While Arnoldi could have invoked a "cat's paw" theory by arguing that Samec influenced Fondas, the deciding official on her suspension, she has not done so. *See, e.g.*, *Samuel*, 258 F. Supp. 3d at 47–48 ("In cases where the person who allegedly has bias against the plaintiff is different from the person or persons who ultimately create the adverse employment action, the employee must show that the formal decision maker was an unwitting conduit of another actor's illicit motives, or, in other words, her cat's paw." (cleaned up)).

Next, Arnoldi argues that Administrator Willson, treated women poorly. *See, e.g.*, Pl.'s Opp'n at 26. She says that "five different employees complained about" Willson and that these complaints included "allegations regarding issues working with women, controlling women,

calling women derogatory names and inviting men only to golf outings." *Id.* Arnoldi thus contends that issues with Willson "could account for [her] treatment." *Id.*

To start, Arnoldi mischaracterizes the record. As the Gallery points out, it appears that she was the only person who claimed Willson was misogynistic. *See* Defs.' Reply at 18; Defs.' Reply Ex. B at 22, ECF No. 18-4. The other complaints cited by Arnoldi dealt with Willson's influence at the Gallery because of his relationship with the Gallery's Director, that he was not being transparent about his retirement, and that he "chooses favorites" (of both genders). Pl.'s Ex. 2 at 3–4, ECF No. 15-2. Samec—her main antagonist—was not one of Willson's supposed "favorites," *see id.*, undermining any argument that the two were in cahoots against her.

Apart from Arnoldi's lack of record support, Willson did not make any decisions surrounding Arnoldi's suspension or termination. *See Samuel*, 258 F. Supp. 3d at 47–48. Fondas decided to suspend her, and Hoffmann decided to remove her. DSMF ¶¶ 95, 125. As with Samec, Arnoldi could have advanced a cat's paw theory to allege that Willson influenced the deciding officials. *See Samuel*, 258 F. Supp. 3d at 47–48. But she has not and therefore forfeits the argument. *See Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (noting that theories of liability not raised to district court are forfeited); *Mason v. Geithner*, 811 F. Supp. 2d 128, 180 n.74 (D.D.C. 2011) (rejecting employment discrimination theory that the plaintiff "*never* argue[d]"). Arnoldi levels no complaints against the two women who decided to suspend and terminate her. She also does not allege that Robbins, who proposed her removal, influenced the deciding officials.

Finally, Arnoldi relies on general allegations about her work environment. For example, she explains that employees at a lower GS-pay-scale level "were permitted to dominate her" at meetings. Pl.'s Opp'n at 24. Even if Arnoldi intends to raise these allegations separately from

her argument that Samec did not stop such behavior, Arnoldi does not connect any of these individuals to her suspension or termination.  *See Samuel*, 258 F. Supp. 3d at 47.  "Title VII does not protect employees from bad managers or workplace conflicts unconnected to discrimination; sometimes people just do not get along."  *Id.*

\*      \*      \*

The Gallery has provided legitimate, nondiscriminatory, and nonretaliatory reasons for Arnoldi's suspension and termination.  For her part, Arnoldi "has failed to identify evidence in the record from which a reasonable jury could conclude that [the Gallery's] proffered legitimate, non-discriminatory and non-retaliatory reasons . . . were pretextual and that [its] real reasons were discriminatory or retaliatory."  *Walker*, 798 F.3d at 1092.

Four people were involved in Arnoldi's suspension and termination.  Samec proposed that she be suspended, but he also hired her—a fact that weakens any inference of discrimination.  *See Vatel*, 627 F.3d at 1247 (explaining that a plaintiff's argument that her employer harbored a discriminatory motive "face[d] a significant initial hurdle in that [the employer] himself selected [the plaintiff] to be his assistant less than a year before her dismissal").  Robbins recommended Arnoldi's removal, but he had become Arnoldi's supervisor just two months before and had no history with her.  *See* DSMF ¶¶ 101–02, 107.  And two women, who did not work with Arnoldi or supervise her, made the decisions to suspend and terminate her.  *Id.* ¶¶ 84–85, 116–17.  That the key decisionmakers fell within Arnoldi's protected class also weighs against a finding of discrimination.  *See Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017) ("Courts in our District have repeatedly held that a decision-maker's inclusion in the same protected class as the terminated plaintiff cuts against any inference of discrimination.").  All of this further undermines Arnoldi's

21

argument that the Gallery's justifications are phony and that it instead intentionally discriminated against her.  *See Brady*, 520 F.3d at 494.

The Court will therefore grant the Gallery's motion for summary judgment as to Arnoldi's discrimination and retaliation claims.

**B.**

Finally, the Court turns to Arnoldi's hostile work environment claim against the Gallery. Pl.'s Opp'n at 26–28.  Caselaw confirms this is a difficult claim to successfully advance.

An employer violates Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).  Whether a work environment is "hostile" or "abusive" is not "a mathematically precise test," but "can be determined only by looking at all the circumstances."  *Id.* at 22–23.  These circumstances include "the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998)).

The Supreme Court has explained that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (cleaned up).  When "[p]roperly applied," these standards "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Id.* (cleaned up).  Indeed, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*  "Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise

to the level of a Title VII violation." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012).

Arnoldi contends her work environment meets this standard. Pl.'s Opp'n at 26–27. But she provides almost no record evidence in support. Indeed, this portion of her opposition contains just one record cite. *See id.* at 27. Arnoldi only broadly argues that she "provides a long list of incidents in her numerous affidavits, responses to the various disciplinary proposals, emails, etc. demonstrating harassment." *Id.* This will not do at summary judgment. *See, e.g.*, *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("[J]udges are not like pigs, hunting for truffles buried in briefs or in the record . . . ." (cleaned up)); *Jeffries v. Barr*, 965 F.3d 843, 860– 61 (D.C. Cir. 2020) ("This Court is not in the habit of doing parties' lawyering for them, and we decline to take up that task now.").

Even considering the evidence Arnoldi has put forward elsewhere in her brief, it could not support a hostile work environment claim.[6] Arnoldi argues that her co-workers were disrespectful to her and that Samec did nothing about it. For example, she says that "the other three deputy chiefs in AFM consistently raised their voices at her, stood up over her while she was talking, talked over her, and were generally aggressive during weekly deputy meetings"; and

---

[6] The Gallery is correct that—at least to Arnoldi's hostile work environment claim based on her protected activity—only evidence occurring *after* her protected activity is relevant. *See* Defs.' Mot. at 50; *Na'im v. Clinton*, 626 F. Supp. 2d 63, 79 (D.D.C. 2009) ("[T]he plaintiff must establish a causal connection between the harassment and her protected activity to succeed on the [retaliation-based hostile work environment] claim."). This would seemingly exclude, for example, some of the conduct outlined in her EEO affidavit, including "shouting directed at" Arnoldi during coaching sessions that began "[i]n January/February 2017" and lasted for six months, as well as an incident in March 2017 when several co-workers "all raised their voices and started yelling at" Arnoldi. Arnoldi Aff. at 4; *see also* Pl.'s Opp'n at 4–7. Samec's inappropriate comments also seemingly took place before Arnoldi engaged in protected activity. *See* Pl.'s Opp'n at 4–6 (suggesting that Samec made these statements before April 9, 2018). But because Arnoldi's retaliation-based hostile work environment claim fails even considering such evidence, the Court will not parse it here.

further, that "during one meeting in March of 2017 . . . a male colleague slammed his hand on the table in anger at [her] and yelled at her about a purchasing decision."  Pl.'s Opp'n at 4. Arnoldi also suggests that Samec and others snubbed her supervisory decisions.  *See, e.g.*, Arnoldi Aff. at 9 (EEO affidavit stating that "[t]hey are not allowing me to retain an employee, supervise my staff or give my staff telework"); *id.* at 5 ("I should not be required to report to a GS-14 with less education and experience.").  And she cites Samec's inappropriate comments. *See, e.g.*, Pl.'s Opp'n at 4–5, 24.

This is inadequate.  Arnoldi has not shown discriminatory and retaliatory conduct that is "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Harris*, 510 U.S. at 21 (cleaned up).  General rudeness of co-workers and supervisors, while unprofessional and undesirable, does not make a work environment hostile or abusive.  *Cf. Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012) ("Even conduct that reflects poorly upon the professionalism of the defendant's employees may not be severe and pervasive enough to create an abusive environment." (cleaned up)).  Courts have recognized that criticism and "even loud expressions of disapproval . . . are the kinds of normal strains that can occur in any office setting."  *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004).

More, "courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors."  *Brooks*, 851 F. Supp. 2d at 7 (cleaned up).  Even when a plaintiff "alleges that she and her work have been regularly disrespected, a Title VII plaintiff must show far more than criticisms and snubs or perceived slights to establish a hostile work environment."  *Id.* (cleaned up); *see also id.* (rejecting plaintiff's claim that she experienced "humiliation" because of "her assignment to responsibilities that she considered to be beneath

her qualifications," "negative performance evaluations," and "a four-month isolation on a 'Team of One'").  As for Samec's comments, while inappropriate, they are more like "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," which the high hostile work environment standard is supposed to "filter out."  *Faragher*, 524 U.S. at 788 (cleaned up).

While Arnoldi "clearly had several verbal clashes with" her supervisor and co-workers, "the totality of circumstances presented in this record does not rise to the level necessary to support a hostile work environment claim."  *Baloch*, 550 F.3d at 1201.  Thus, the Court will grant the Gallery's motion for summary judgment as to Arnoldi's hostile work environment claim.

## IV.

The evidence shows AFM was less than an ideal workplace, and Arnoldi likely endured some unprofessional conduct as a result.  But the evidence also shows that she was a willful employee who thought she knew better than her bosses.  Perhaps she did.  But it was not illegal for her employer to discipline her for repeated insubordination.

For all these reasons, Defendants' Motion for Summary Judgment will be granted.  A separate Order will issue.

Dated: July 26, 2021                                        TREVOR N. McFADDEN, U.S.D.J.